GUIDRY, Justice.*
11 We granted Lafayette Insurance Company’s writ application in this class action lawsuit arising out of Hurricane Katrina to determine whether the lower courts correctly applied the standards for analyzing class certification set forth in Louisiana Code of Civil Procedure art. 591 et seq. After reviewing the record and the applicable law, we conclude the lower courts, under the facts of this case, erred in finding that common questions of law or fact exist, that substantive questions common to members of the class predominate over any questions affecting only individual members, and that a class action is superi- or to other available procedural methods for the fair and efficient adjudication of the controversy. Accordingly, for the reasons set forth below, we reverse the judgment of the trial court certifying the class.
FACTS AND PROCEDURAL HISTORY
On August 29, 2005, Hurricane Katrina struck the Gulf Coast, causing widespread damage as a result of both wind and storm surge. The named plaintiff and additional named representatives are residents of St. Bernard Parish, whose homes were insured under homeowner policies issued by the defendant, Lafayette Insurance 12Company [hereinafter “Lafayette”]. The original petition filed by Charles Dupree on November 23, 2005, alleges the plaintiffs experienced wind damage to their properties as a result of the hurricane.[1] The petition further alleges the plaintiffs made timely claims under their respective Lafayette policies but Lafayette denied or expressed an intent to deny coverage for the wind damage, by contending incorrectly that the roof damage, structural damage, and other damage to their properties were flood related and not caused by a covered peril, namely wind. The petition *677 specifically alleges Lafayette “systematically, intentionally and improperly denied [their] wind damage claims and [] purposely made up, fabricated and concocted unsupported (and sometimes incredible) theories, reasons and/or excuses for refusing to cover damage that was caused by wind.” Orig. Pet., Para. VIII. The petition also alleges Lafayette “has misapplied the terms of its own policies by making improper deductions from [the plaintiffs’] claims.” Id. The petition further alleges Lafayette sought to force and coerce the plaintiffs into accepting settlements on their claims that Lafayette knew were unfair, unrealistically low, and inaccurately reflected the damage caused by the wind or the cost of repairing the wind damage. The petition also alleges Lafayette took advantage of the plaintiffs’ personal problems and adversity to make minimal and inadequate offers. The petition next alleges Lafayette took advantage of its superior bargaining position, breached its duty of good faith and fair dealing, and breached its affirmative duty to adjust claims fairly and timely “by misrepresenting pertinent facts relating to the insurance coverage provided.... ” Orig. Pet., Para. XI. These actions, the petition alleges, constituted bad faith and give rise to a cause of action for double damages, penalties, attorney’s fees, expenses and costs under Louisiana law, including those under La.Rev.Stat. 12:1220.
IsWith regard to the class, the petition asserts that hundreds of residents were damaged and continue to be damaged as a result of Lafayette’s conduct “in denying and/or misadjusting and/or coercing [the plaintiffs] into accepting inadequate settlements.” Orig. Pet., Para. XIII. The petition asserts the predominate questions will be: (1) “Whether wind damage claims (a covered cause of loss) were systematically, intentionally and/or improperly denied and/or intentionally under-valued and under-assessed by [Lafayette];” and (2) “Common facts arising out of the concerted and centrally directed claims adjusting practices implemented by [Lafayette].” Orig. Pet., Para XIV. The First Supplemental and Amended Petition added Robert Barback, Dennis and Lucy Juneau, and Gordon Smith as named representatives.[2] The Supplemental Petition also sought compensatory damages, pre-judgment interest, and all costs including attorney fees.
In the motion for class certification filed on March 31, 2006, pursuant to La.Code Civ. Proc. art. 592, the plaintiffs sought a class to be defined as “All persons whose property, located in Louisiana and covered by an insurance policy issued by defendant, sustained wind damage in connection with Hurricane Katrina on or about 29 August 2005 and whose claim for wind related damage to their property has been denied, in toto or partially, or misadjusted by Lafayette Insurance Company and/or its adjusters and/or other representatives.”[3] The plaintiffs asserted the proposed class satisfied the prerequisites set forth in Louisiana Code of Civil Procedure Articles 591(A) and (B). A hearing on the class certification issue was conducted on July 10, |411, and 14, 2008. The matter *678 was submitted for decision after receipt of all post-trial memoranda, and on August 13, 2008, the trial court rendered a judgment granting the plaintiffs’ motion for class certification, certifying a class that included commercial policies. Lafayette filed a Motion for New Trial or alternatively to limit the class to homeowner’s policies, which the trial court granted.
The trial court, after amending its initial judgment to delete commercial policies, certified the class and issued the following class definition:
All persons whose property is located in St. Bernard, Plaquemines, Orleans, St. Tammany, Jefferson, St. Charles, Tangipahoa and Terrebonne Parishes Louisiana and covered by a homeowner’s insurance policy issued by Lafayette Insurance Company, sustained wind damage in connection with Hurricane Katrina on or about the 29th of August 2005 and whose policy for benefits related to wind damage to their property has been denied in toto or partially misadjusted by Lafayette Insurance Company and/or its representatives by:
1. By using repair estimates, whether derived by Xactimate or other means to use pre-Katrina pricing information to adjust claims that are lower than the higher post Katrina prices of goods and services.
2. By excluding in the repair or replacement estimates for roofs damaged by failing to include the cost of overhead and/or profit where a General Contractor is to be used or circumstances require, the inclusion of overhead and profit.
3. By failing to include the cost of permits and sales tax in repair estimates used to adjust claims.
4. By failing to properly adjust additional living expense’s loss [sic] when the relocation or displacement resulting from windstorm required the insured to relocate and thereby incurred additional living expense.
5. By failing to properly adjust civil authority claims to recognize that the coverage is available when the damage to adjacent property from wind results in the civil authority to prohibit entry or occupancy of the insured property, whether the insured property itself is damaged by wind or not.
6. By failing to pay claims within the prescribed statutory period of 30 or 60 days after satisfactory proof of loss when such loss is arbitrary, capricious and without probable cause.
Lafayette appealed the trial court’s ruling, and the court of appeal affirmed. Dupree v. Lafayette Ins. Co., 09-0321 (La.App. 4 Cir. 10/14/09), 41 So.3d 483. The appellate court found no reversible error in certifying the class; however, it did find a “problem” with the definition of the class, and it remanded the case to the trial court with instructions to remove the language “when such is arbitrary, capricious and without probable cause” from Item 6 in the trial court’s class definition.[4] We granted Lafayette’s writ application to review the correctness of the lower courts’ rulings. Dupree v. Lafayette Ins. Co., 09-2602 (La.5/21/10), 36 So.3d 220.
APPLICABLE LAW
The requirements for a class action in Louisiana have been thoroughly discussed in several recent decisions of this court. *679 See Brooks v. Union Pacific R. Co., 08-2035 (La.5/22/09), 13 So.3d 546; Banks v. New York Life Ins. Co., 98-0551 (La.7/2/99), 737 So.2d 1275 (on rehearing); Ford v. Murphy Oil U.S.A., Inc., 96-2913 (La.9/9/97), 703 So.2d 542. The legislature in 1997 extensively revised Louisiana Code of Civil Procedure Article 591 et seq., essentially adopting current federal law, Fed. Rule Civ. Proc. 23, and codifying this court’s class certification jurisprudence.[5] Because this suit was filed in 2006, this court is called upon to apply | fithe revised Louisiana codal articles on class actions.
As we recently explained in Brooks, a class action is a nontraditional litigation procedure that permits a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common interest to persons so numerous as to make it impracticable to bring them all before the court. 08-2035, pp. 10-11, 13 So.3d at 554 (citing Ford, 98-2913, 703 So.2d at 544). The purpose and intent of the class action procedure is to adjudicate and obtain res judicata effect on all common issues applicable not only to persons who bring the action, but also to all others who are “similarly situated.” Id.
Whether a class action meets the requirements imposed by law involves a “rigorous analysis.” Brooks, 08-2035, p. 10, 13 So.3d at 554. Such an analysis, this court has explained, requires the trial court “to evaluate, quantify and weigh the relevant factors to determine to what ex *680 tent the class action would, in each instance, promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness.” Id. (quoting McCastle v. Rollins Environmental Services of Louisiana, Inc., 456 So.2d 612, 618 (La.1984)). “Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.” Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996); see also Kent A. Lambert, Certification of Class Actions in Louisiana, 58 La. L.Rev. 1085, 1117 (1998).
This court has stated that any errors to be made in deciding class action issues should be in favor of and not against the maintenance of the class action, because a class certification is “always” subject to modification or decertification “if later developments during the course of the trial so require.” Id. (quoting McCastle, 456 So.2d at 620). To that end, La. Code. Civ. Proc. art. 592(A)(3)(c) provides that the trial court “may alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.” La.Code. Civ. Proc. art. 592(A)(3)(c). Nonetheless, the trial court should evaluate the case closely before certifying the class in light of the consequent burdens of giving notice and additional discovery. See McCastle, 456 So.2d at 616; see also Frank L. Maraist, 1 Louisiana Civil Law Treatise: Civil Procedure, § 4.12, p. 105 (2d ed.2008).
In reviewing a trial court’s judgment regarding class certification, the trial court’s factual findings are subject to the manifest error standard; however, the trial court’s ultimate decision of whether or not to certify the class is reviewed under the abuse of discretion standard. Brooks, 08-2035, p. 10, 13 So.3d at 554 (citing Banks, 98-0551, 737 So.2d at 1280). “Implicit in this deferential standard is recognition of the essentially factual basis of the certification inquiry and of the district court’s inherent power to manage and control pending litigation.” Id., p. 11 (quoting Gene and Gene L.L.C. v. BioPay L.L.C., 541 F.3d 318, 325 (5th Cir.2008)).
In Louisiana, class actions are governed by Louisiana Code of Civil Procedure art. 591 et seq. As previously noted, these articles were comprehensively revised by the legislature in Acts 1997, No. 839, § 1, effective July 1, 1997. Article 591(A) now provides that a class action must meet five threshold prerequisites, often referred to as numerosity, commonality, typicality, the adequacy of representation, and an objectively definable class. Specifically, the article requires that:
(1) The class is so numerous that join-der of all members is impracticable.
(2) There are questions of law and fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of conclusiveness of any judgment that may be rendered in the case.
In addition to these five prerequisites, Article 591(B) lists additional criteria, depending on the type of class action sought by the parties. The applicable additional consideration in this case is set *681 forth in Article 591(B)(3).[6] For this type of class | gaction, the trial court must find:
(3) [T]hat the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class is superior to other methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as *682 may be implicated, justifies the costs and burdens of class litigation.
The legislature has specifically provided, emphasizing the commonality and predominance requirements, that class “[ejertifi-cation shall not be for the purpose of | madjudicating claims or defenses dependent for their resolution on proof individual to a member of the class.” La.Code. Civ. Proc. art. 591(C); see also Ford, 96-2913, 703 So.2d at 549 (former La.Code Civ. Proc. art. 593.1(C) prohibits class certification when too many individual liability issues exist that could not be tried separately). Nevertheless, where certification is maintained, “the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to a member of the class.” La.Code Civ. Proc. art. 591(C). The latter provision recognizes “the mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove them right to recover does not preclude class certification.” Bartlett v. Browning-Ferris Industries Chemical Services, Inc., 99-0494 (La.11/12/99), 759 So.2d 755, 756 (citing McCastle, 456 So.2d at 620; State ex rel. Guste v. G.M. Corp., 370 So.2d 477, 489 (La.1978)).
DISCUSSION
The burden of proving that the statutory class certification criteria have been satisfied belongs to the party seeking to maintain the class action. Defraites v. State Farm Mut. Auto. Ins. Co., 03-1081, p. 6 (La.App. 5 Cir. 1/27/04), 864 So.2d 254, 259, writ denied, 04-0460 (La.03/12/04), 869 So.2d 832. Therefore, in this case, the plaintiffs were required to prove all of the requirements of La.Code Civ. Proc. art. 591(A), namely numerosity, commonality, typicality, adequacy of the representative, and objectively definable class, but also, under La.Code Civ. Proc. art. 591(B)(3), the plaintiffs were required to prove that common questions of fact or law predominate over individual issues and that the class action procedure is superior to any other method for resolving the controversy fairly and efficiently. Howard v. Willis-Knighton Med. Ctr., 40,634 (La.App. 2 Cir. 3/8/06), 924 So.2d 1245, writs denied, 06-0850 (La.06/14/06), 929 So.2d 1268, and 06-1064 (La.06/14/06), 929 So.2d 1271. We find the trial court erred in finding common factual or legal issues and in finding these issues predominate over individual questions. Accordingly, we find the trial court abused its discretion in certifying the class.
The legislature has long mandated that the class action procedure is permissible and justified only where there are questions of fact or law common to the class and that these common issues predominate over individual issues. This is true both before and after the revision of La. Code Civ. Proc. art. 591. See generally, McCastle; Brooks; La. Code Civ. Proc. art. 591.[7] To satisfy the commonality requirement, there must exist “as to the totality of the issues a common nucleus of operative facts.... ” McCastle, 456 So.2d at 620. A common question is one that, *683 when answered as to one class member, is answered as to all of them. Howard, 40,634, p. 29, 924 So.2d at 1262 (citing Forbush v. J.C. Penney Co., Inc., 994 F.2d 1101 (5th Cir.1993)).
In addition to proving questions of law or fact common to the members of the class exist, the plaintiffs also must establish under Art. 591(B)(3) that these common issues predominate over any individual issues and that the class action procedure is superior to any other. The inquiry into predominance tests “whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.” Brooks, 08-2035, p. 19, 13 So.3d at 560 (quoting Amchem Products, Inc.v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997)). This court has explained that the predominance requirement is more demanding than the commonality requirement, because it “entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class,” a process that ultimately “prevents the class from degenerating into a series of individual trials.” Id. (quoting O’Sullivan v, Countrywide Home Loans, Inc., 319 F.3d 732, 738 (5th Cir.2003)). Since revision in 1997, La.Code Civ. Proc. art. 591(B)(3)(a)-(f) set forth “matters pertinent” to be considered in determining whether the common questions predominate over questions affecting only individual members, and whether a class action is superior to other available methods for the fail' and efficient adjudication of the controversy. With these considerations in mind, we must rigorously analyze the plaintiffs’ claims to determine whether the common substantive issues, if any, predominate over individual questions, and whether the class action procedure is superior to any other under these facts.

Plaintiffs’ Claims

In the instant case, the plaintiffs contend “common threads” run through their case against Lafayette: all class members are Lafayette insureds who owned property in Southeast Louisiana that was damaged by severe winds related to Hurricane Katrina; all class members are insured under Lafayette homeowner policies; and all class members were victims of one or more of the improper adjusting practices set forth in the class definition. The plaintiffs then assert the common questions of fact involve the consistent failure of Lafayette to properly pay amounts owed under its homeowner policies and Louisiana law by systematically engaging in certain specific and improper adjusting practices.
|1sAs to the common factual issues, the plaintiffs assert Lafayette’s adjusters consistently used pre-Katrina pricing to estimate repairs to homes damaged by Hurricane Katrina, and Lafayette knew that prices had escalated after Katrina but failed to instruct its adjusters to ensure repair estimates were accurate. As to living expenses under civil authority coverage, the plaintiffs assert Lafayette consistently and uniformly denied living expenses under civil authority coverage to its policyholders and failed to instruct its adjusters to address such coverage; further, Lafayette failed to investigate whether civil authority decrees were issued in any of the eight parishes. The plaintiffs next assert that Lafayette, as a company-wide policy, failed to pay additional living expenses (hereinafter “ALE”) as a result of covered damages to their homes, and they contend Lafayette neither instructed outside adjusters on how to adjust ALEs, nor attempted to calculate a percentage payment of ALEs when wind and water combined to make the home uninhabitable. The plaintiffs also *684 assert that Lafayette consistently failed to pay overhead and profit for roofing repairs and other wind damage-related repairs. The plaintiffs maintain Lafayette consistently failed to pay the costs of permits for repairs and the proper amount of sales tax for the repair items in the various parishes; nor did Lafayette instruct its adjusters regarding these payments. Finally, the plaintiffs claim that Lafayette failed to make payments timely, noting that payments were sometimes mailed to the address of the damaged property and some plaintiffs have still not received amounts owed them under the policies in violation of Louisiana law.
The plaintiffs identify the common legal issues as whether Lafayette breached its policies and duties under Louisiana law when it failed to pay ALE and civil authority amounts, when it refused to compensate policyholders for profit, overhead, permits, and accurate sales tax, when it knowingly used outdated pricing data, | ^resulting from uniform underpayment to policyholders, and when it failed to pay timely.
The defendant asserts the plaintiffs’ claims depend on the unique factual circumstances of each plaintiff or putative class member, such that class certification is inappropriate. The defendant contends the plaintiffs are essentially asserting a general adjusting practices claim, which federal courts have uniformly rejected as not suitable for class action.[8] The defendant argues that whether it breached any duty owed to any particular policyholder depends on the specific facts surrounding the damages to that policyholder’s property-

Use of Xactimate Software Using Pre-Katrina Pricing

We will address each allegedly improper adjusting practice in turn. With regard to the use of estimating software using pre-Katrina pricing, the trial court found little question that a post-Katrina price surge was evident for nearly all materials and labor. The trial court further found the plaintiffs produced evidence that Lafayette did not provide any instruction or guidance to its outside adjusters on the use of a uniform computer software updated for post-Katrina prices. The trial court reasoned that the use of pre-Katrina prices in repair estimates would result in inadequate payments to the insured, and to the extent that direction and guidance to Lafayette’s adjusters were present and the use of pre-Katrina pricing is evident, the plaintiffs had stated a cause of action suitable for a class action. The trial court | ^acknowledged the arguments of the defendant: that Lafayette relied on the experience of independent adjusters whom they had hired in the past, that the plaintiffs have not established the date of the pricing actually used by Lafayette or its outside adjusters, and that the plaintiffs’ expert had concluded a new roof was necessary *685 on each of the properties, causing his repair estimates to be inflated. The trial court found these issues proper for the merits of the action at trial. The plaintiffs argue a common question predominates as to whether Lafayette underestimated repair costs for its insureds after the hurricane when it knowingly used outdated material and labor costs.
Whether the plaintiffs have stated a cause of action is not the proper inquiry in determining if the class action procedure is superior. See Marsh v. USAgencies Cas. Ins. Co., 42,176, pp. 5-6 (La.App. 2 Cir. 5/16/07), 957 So.2d 901, 906, unit denied, 07-1286 (La.10/26/07), 966 So.2d 575. Our review of the record does not establish that the operable facts necessary to resolve the question of whether the claims were misadjusted using improper pricing data are common to the class, or that there is a common question which predominates over individual claims or defenses thereto. The subclass of plaintiffs concerning pricing is described as follows by the trial court: “By using repair estimates, whether derived by Xactimate or other means to use pre-Katrina pricing information to adjust claims that are lower than the higher post Katrina prices of goods and services [sic].” The evidence at the hearing on class certification reveals that whether the proper or most up-to-date pricing was used by the particular independent adjuster, or Lafayette’s adjusters, for any property damage claim turns on the specific facts of that individual claim. In short, whether the correct repair estimate was made and whether the most appropriate pricing was used at the time of Lafayette’s adjustment of the claim turns on the specific facts and merits of each individual claim.
|1fiWesley Baldwin testified for the plaintiffs as a public insurance adjuster, an adjuster who is usually hired by a policyholder/claimant to prepare and handle the insurance claim. Baldwin was not an expert in pricing, nor had he made a written property estimate in over 25 years. Baldwin did not view any of the properties of the named plaintiffs; he did not know the date of the pricing used by the independent adjusters for any of the named representatives; he did not know what software had been used by any of Lafayette’s adjusters, whether in-house or outside; and he did not have a suggested price list that should have been used by Lafayette’s adjusters. Instead, he testified that he relied on a contractor for price estimates, Peter Reed of Flagship Construction, Inc.[9] Baldwin testified that, in his experience, there had been a shortage of labor and materials after the storm that resulted in higher prices. He stated the Xactimate estimating software depends on the pricing data input, which data comes from general contractors and professional estimators. He reviewed eleven files and noted the “thrust” of the reports prepared by the adjuster relied “more on” flood damage than on wind damage. On cross-examination, Baldwin admitted that public adjusters use the same estimating software used by independent adjusters, i.e., the outside adjusters hired by Lafayette, and he acknowledged that Xactimate is an industry standard program. Baldwin testified, however, that he did not use such software. He conceded he had seen nothing in the reviewed files indicating adjusters were advised either to adjust claims differently from how they had done so for any of their other client insurance companies or to use a particular pricing profile.
Jonathan Drennan, a general and residential contractor, also testified for the plaintiffs. His firm in April 2007 prepared *686 repair estimates on 36 properties, including those of the named plaintiffs. He admitted that he does not prepare the cost 117estimates or input the data, nor did he visit any of the properties. Instead, he relied on an employee, Ross Kelly, to prepare the repair and cost estimates.[10] Drennan did not know the date or pricing information used by the primary adjuster for any of the properties. He prepared three reports on each property: one used Xactimate at the time he prepared the report in April 2007 without adding general contractor overhead and profit (hereinafter, “GCOP”); another was the same but included GCOP; and the third report was based on his employee’s opinion as to the proper scope of the work, i.e., whether the damage was due to wind or water, and the extent thereof, and what they thought the correct pricing should have been. Dren-nan admitted that neither he nor his employee was an expert in determining wind versus water damage, nor had he consulted flood maps. He testified the prices in April 2007 would have been lower than prices were 2005 or 2006, when the claims of the named representatives were first adjusted. He opined that Lafayette had consistently underpriced estimates, noting the repair estimates in 2006 would have been higher, that GCOP was not included, and that Lafayette did not pay for permits or sales taxes. In his view, the properties all were severely damaged by wind, and the roof on each property should be replaced. However, he conceded that if the roof required only repair rather than replacement, the differences between his repair estimates and the estimates of Lafayette’s adjusters would be less.
As to the software, Drennan testified his own firm uses Xactimate but cautioned it must be updated, adding “for the most part it’s pretty good. It’s very thorough.” On cross-examination, Drennan admitted that he did not speak to anyone at the outside adjusting firms used by Lafayette, that he did not know whether 11sLafayette had given instructions regarding a certain pricing or underpricing, and that he had not made any historical inquiry into pricing. However, when questioned by the court, he stated he had purchased materials in 2007 and was familiar with pricing.
Lafayette called Bruce Miller, the assistant vice president of claims and property manager for United Fire & Casualty Company, of which Lafayette is a wholly owned subsidiary. He explained that Lafayette had some 13,000 homeowner policies in Louisiana when Katrina struck.[11] Lafayette received about 11,000 claims resulting from Katrina. Of those claims, 350 to 400 ultimately became the subject of a lawsuit; the defendant points out this figure represents about 3% of the claims received. About 250 of these claims were outstanding at the time of the hearing. Lafayette hired independent adjusters, contracting with three established firms: Crawford & Company; Cunningham Lindsey; and Property Loss Consulting. Lafayette gave no specific instructions to these firms *687 because, in Miller’s view, they were experienced adjusting firms the company had hired in the past. The adjusters were directed to a toll-free telephone number if they had coverage questions regarding Lafayette’s policies. Lafayette issued general instructions to its in-house adjusters regarding proof of loss (standard proof not required), deductibles, and re-inspections (not required, case-by-case). The company placed general guidelines in the form of “catastrophe notes” on the Internet.
As to software, Miller stated Lafayette used Power Claim, while the adjusters used programs such as Xaetimate and In-tegriClaim. Lafayette gave no directions on what software to use. Miller explained that adjusters are paid a percentage of the claim, i.e., the adjuster’s estimate, so, in his view, there is no incentive for the adjuster 119to underestimate the claim. As to pricing, Lafayette was aware of higher post-storm prices, and it instructed adjusters to review each file to see if the estimates were adequate and to use different resources for accuracy. Miller stated that Lafayette would modify the adjustment if it were deemed too low, and he noted the adjusters could and did consult other sources. Miller acknowledged Lafayette communicated to its adjusters regarding prices; however, he denied instructing adjusters to use below-market pricing. He stated the estimating software database does not include so-called “surge” pricing, but he explained the software company develops localized pricing for its estimating program. Miller also testified supplemental payments were not made solely at the request of the claimant, but the company sometimes made them upon receipt of the claim documents.
On cross-examination, Miller admitted Lafayette was aware of the price increases in July 2006, having received an e-mail about a surprisingly low price from one adjuster and having been aware the company was making supplemental payments to claimants. Miller admitted the company did not thereupon send out specific pricing directives, but he stated the in-house staff were directed to review each file. He explained Lafayette had adjusters on each claim review the file and compare it to information in the file, estimates, and other sources. If there was a difference, then the adjuster made further inquiries. Miller testified that Lafayette did not give specific instructions to outside adjusters because he believed them to be capable of adjusting the claim properly.
Larry Elliott also testified for Lafayette. Elliott is a retired adjuster from Crawford & Company; he was a field operations supervisor in the catastrophe division, and was a project manager for Louisiana claims following Katrina. He explained that Crawford uses Xaetimate and that the updates to the software on |2()pricing are sent not only to Crawford but also to all adjusters using the software. He explained that the adjuster is prompted to update the software whenever updates are available. Elliott testified that pricing is tied to ZIP Codes, and that contractor estimates can be and are given to the insurance company. He stated that Crawford used the most current pricing available when it adjusted claims. He testified Lafayette did not instruct Crawford to use below market pricing. He stated Crawford adjusted claims for Lafayette just as it did for any other insurer with whom it had contracted for adjusting services. On cross-examination, Elliott acknowledged the adjuster determines the scope of covered damage, including wind and water.
Paul Helmick was the adjuster on the claim filed by Charles Dupree. In his view, the extensive damage to Mr. Du-pree’s home was caused by flooding: he noted a refrigerator and other debris were *688 on top of the roof, which indicated to him the storm surge had risen above the roof line if not above the ridge of the roof. He believed the roof had minimal wind damage. With regard to pricing used, he admitted pricing after the storm would necessarily be that which was available pre-storm unless it was updated, noting the pricing adjustment for cost spikes is not automatic.
From this evidence, it is clear no common factual issues predominate with regard to whether Lafayette misadjusted the repair estimates by using outdated or pre-Katrina pricing.[12] While there is evidence Lafayette was aware of the price increases, there is no evidence Lafayette instructed its adjusters to use pre-Katrina or belowjmarke^i pricing. Instead, to determine the merits of each plaintiffs underpricing claim, each claim must be individually examined to determine the cause, extent, and scope of the damages, whether from wind or storm surge. This factual basis for each claim must be established before it can be determined if the particular damage is covered under Lafayette’s homeowners’ policy, because only windstorm was an insured peril. On that determination, the factfinder will then be called upon to decide when the adjustment was performed, who performed the adjustment, whether the pricing data actually used by either the independent adjuster or Lafayette’s adjuster were the most appropriate when the claim was filed and adjusted, and whether supplemental payments were later made by Lafayette. There is no “common nucleus of operative facts” on which to find the defendant systematically misadjusted the plaintiffs’ claims by using pre-Katrina pricing, because whether a claim was in fact knowingly underpriced will necessarily turn on a myriad of individual factual issues.

General Contractor Overhead and Profit for Roof Replacement or Repair

In this proposed subclass, the plaintiffs assert their claims were misad-justed “[b]y excluding in the repair or replacement estimates for roofs damaged by failing to include the cost of overhead and/or profit where a General Contractor is to be used or circumstances require, the inclusion of overhead and profit (sic).” The plaintiffs assert a common issue that predominates is whether Lafayette systematically failed to pay overhead and profit for roofs and other repairs. The trial court found the plaintiffs had offered evidence to show that Lafayette and/or its outside adjusters failed to include overhead and profit in the repair estimates in their adjustment of claims for roof damage. The trial court found that, “if the work undertaken for repairs necessitated the employment or contracting of a general contractor, overhead and profit should be included in the repair estimate and to systematically exclude | ^overhead and profit in such a situation would result in an inadequate repair estimate and lower adjustment.” As with the pricing claim, we find the trial court committed manifest error as there are no common factual issues that predominate with regard to *689 whether roof replacement was necessary, whether a general contractor was necessary to replace the roof or make repairs, or whether the roof damage was the result of an insured peril.
Gina Dupree Kennel, whose deceased father was the original named plaintiff, Charles Dupree, testified the wind damage payments received from Lafayette were not sufficient or adequate. She first saw the property in 2006, and testified that she did not see flood lines on the home, though she did see pictures of the refrigerator on the roof. She admitted that one of her brothers, who were co-owners, would know more than she did about the damages and payments received; her father was a usu-fructuary. She admitted her father was paid under the flood policy and by Lafayette, but he did not obtain a contractor estimate or make a supplemental claim. She stated her complaint was that Lafayette offered an insufficient amount for damages, that her father was not reimbursed for his time away from the property, and that he was not allowed any rental income reimbursement.
Gordon Smith is a named plaintiff. He testified his roof was two-thirds gone when he returned to his home. He stated he could not move home because the home was uninhabitable. Although he was paid by Lafayette for replacement of his roof, when he was asked if he received the full amount necessary for repair, he responded that his roof should have been replaced with corrugated metal rather than plain flat metal. He testified he made a supplemental claim when he requested mediation.
Dennis Juneau, a named plaintiff, was at a local church during the storm. He saw roofs and trees flying during the storm, with flood waters coming in between [ ¾¾9:00 and 10:00 that morning. He admitted there may have been some water damage to the second floor of his home, but noted trees were on top of the roof. The roof was damaged and had shingles missing; he could not say what additional damage was caused by Hurricane Rita, which struck the area approximately six weeks after Katrina. His house had shifted, but he did not know the cause. He did not tell Lafayette that the cost of repairs exceeded what Lafayette had paid. He claimed he did not receive adequate compensation for the damages.
Shontel Campos testified her home suffered wind damage, though she admitted the water had been up to her shoulders. She claimed she was not paid amounts due her, though she never submitted in writing a claim for any additional amount. Her property was reinspected, however, and she was paid additional amounts. She claimed roofing shingles were torn off the roof of her home. She testified that, though the money she received was sufficient to repair the house’s roof, it was not sufficient to repair other damages.
Jason Campos, Shontel’s husband, testified he did not receive sufficient funds to cover wind-related damages, such as a new roof on his shed, a satellite dish, and missing soffit and fascia. He also complained he had received only enough money to clean his air-conditioning unit, when it should have been replaced.
Robert Barback, a named representative, testified there was some wind damage to his home, a one-story slab building. He claimed there was damage to the rear corner of the roof, shingles and tar paper were missing, and the roof was leaking. Although Lafayette sent him a check for the repairs, he did not negotiate it because he thought it would release Lafayette from further obligations. He claimed his roof cost $9,000.00 to replace, but Lafayette offered only $3,547.91. He testified he sent estimates but Lafayette disputed the *690 additional cost. He admitted 7½ feet of water [^had entered the home. He nonetheless asserted Lafayette did not fairly estimate the amount and cost of repairs.
General contractor Jonathan Drennan testified for the plaintiffs that almost every roof of the properties on which he had prepared a report needed to be replaced. His repair and cost estimates were thus based on completely replacing the roofs. With regard to general contractor overhead and profit, he testified that the amounts in the Lafayette files were frequently incorrect and that GCOP was not included properly. With regard to Du-pree’s claim, he testified a general contractor overhead of ten percent was allowed, but not on every item. With regard to the Campos claim, he testified general contractor overhead and profit was allowed, but not on every item on which it should have been allowed. He gave the same opinion with regard to other named plaintiffs. He opined that not every job requires a general contractor but that it is a personal preference. At his deposition, he insisted that, even if a roofing contractor had given a bid to replace a roof, Lafayette should have allowed general contractor overhead and profit, even when no general contractor was hired. He testified he would have charged twenty percent overhead and profit whenever he employed a sub-contractor.
Lafayette’s representative, Bruce Miller, testified that general contractor overhead and profit was allowed and paid when applicable. He explained that GCOP is allowed if multiple trades are involved in the repair of the covered damage; however, GCOP would not be allowed if a roofer only was needed to perform the repair. He testified Lafayette never instructed adjusters to deny GCOP.
Helmick, the adjuster on Dupree’s claim, testified there was minimal damage from wind to Dupree’s roof. He noted the elevated portion of the rear addition roof had been “propped up with a pan” following the storm, which he deemed “pretty | gsunusual.” He further noted that a refrigerator was on top of the home’s roof and that some wood had floated on top of the roof. He believed the home had not suffered any significant wind damage; instead, he testified flood water had risen above the roof line and possibly the ridge of the roof. He admitted the insured, who was present at the property, disagreed with the estimate, and claimed the wind had lifted the roof allowing significant water into the home. Helmick testified he included general contractor overhead and profit, but not for contents. He explained that a general contractor was not needed for certain losses, only for multiple damages, or when multiple trades, three or more, are needed to repair the covered damages. On cross-examination, the witness testified he thought flood water had caused the roof to lift.
Van Fisher testified for Lafayette as a civil engineer with an emphasis on structural engineering. He was the catastrophe leader for Project Time & Cost, and he had developed its forensic engineering services. He explained that his job was to determine the scope of damages from wind versus storm surge. Factors he considered were density of the buildings in the area, height of buildings, differences in wind and storm-surge energy, and distance from the eye of the storm. To make a damage estimate, Fisher explained, he looked at the individual structure, the surrounding structures, the topography, wind speeds, and water heights. He opined that Katrina had affected each parish differently with respect to flooding and wind speed. Fisher testified that in southern St. Bernard Parish, there was significant wind and flooding, while in the northern *691 part of the parish there was a lesser degree of wind, but a tremendous amount of flooding. Other parishes had similar differences, he noted. Plaquemines parish had mostly wind damage in Belle Chasse; in Jefferson parish, there was less wind further from the eye, no flooding on the West Bank, and on the East Bank, there was flooding but minor wind. In Orleans parish, he testified, there ]2r,was major flooding but minimal wind. In St. Tammany parish, he noted, coastal areas experienced more surge, but Slidell also had high wind. Inland St. Tammany, St. Charles, Tangipahoa, and Terrebonne parishes experienced mostly wind, in Fisher’s opinion. He noted wind effects varied from parish to parish, neighborhood to neighborhood, and even within neighborhoods.
With regard to Dupree’s home, Fisher noted it had not been repaired, though it had been gutted. He saw only minor wind damage to the roof, with very few shingles missing; he disagreed with the plaintiffs’ witness Drennan that a new roof was necessary. With regard to Barback, he noted the home had been repaired. He testified the Campos home had also been repaired, and that its roof showed only spot repairs. With regard to the Juneau home, he testified the home had not been repaired, but the roof had no significant damage, with only some areas showing signs of normal aging. He disagreed with Drennan that the Juneau home required a new roof.
This evidence shows similar factual questions might exist, but no common factual issues predominate with regard to the plaintiffs’ assertion that Lafayette misad-justed their claims by excluding in the repair or replacement estimates for damaged roofs, overhead and/or profit where a general contractor was to be used or circumstances required the inclusion of such overhead and profit. Because the determination of whether the services of a general contractor would be reasonably likely to be required is a fact question that will be different for every insured, the trial court manifestly erred in finding that common factual issues exist and that such issues predominate over individual questions with regard to general contractor overhead and profit for wind-related roof damages. Before a plaintiff can establish that Lafayette misadjusted his or her claim by refusing to allow GCOP for repair or replacement of a roof damaged by windstorm, the factfinder must first determine whether the roof l27was damaged by a named peril, i.e., the scope of the damages. The plaintiffs will likely assert their roofs were damaged by a covered peril, windstorm, whereas the defendant will likely attempt to prove the roofs were damaged by an excluded cause, such as storm surge. Once that factual determination is made, the factfinder would next be required to determine whether the claimant’s roof required replacement or could be repaired, the extent of the damages, and whether the complexity of the repair or roof replacement necessitated the engagement of a general contractor to supervise and coordinate the work. These are inherently individual factual issues which preclude a class-wide factual inquiry or resolution.[13]

*692
Permits and Sales Tax

The plaintiffs also assert their claims were misadjusted by Lafayette by failing to include the cost of permits and sales tax in repair estimates used to adjust their claims. They assert a common factual issue exists as to whether Lafayette systematically failed to pay for permits and to pay the proper amount of sales tax to the insureds. The trial court found the repair estimates should have included the cost of all required permits and sales taxes, and “[t]o the extent those items were excluded, the repair estimate is artificially low and inadequate to compensate the loss.”
We find the trial court also manifestly erred in finding common factual issues l2¿with regard to permits and sales taxes and that these issues predominate over individual questions. Other than general assertions they were not paid sufficient amounts for wind damage, the named representatives did not specifically testify they were denied the costs of permits when a permit was required before the repair could be made or that they were paid improper sales taxes. Drennan generally testified, based on his reports, that Lafayette did not pay for permits or calculate taxes correctly; however, he admitted he had used the incorrect sales tax percentage in his own reports for St. Bernard Parish. Drennan also testified in his deposition that permits would be required for almost any repair work done by a contractor, though he conceded they might not be necessary for the homeowner under some circumstances. Lafayette’s representa-five, Miller, agreed costs of permits and sales taxes were payable where allowed, and he stated Lafayette did not instruct adjusters to deny costs of necessary permits or disallow sales taxes when applicable. Indeed, Helmick, who adjusted Du-pree’s claim, testified he included sales taxes in his estimate. The other claim files submitted by the plaintiffs showed sales taxes had been included in the estimates. As with GCOP, then, the factfin-der would have to determine whether the particular damage was due to a covered peril, whether a permit was required to repair the damage, and whether the claimant was denied costs of the permit. Similarly, for sales taxes, the factfinder would have to determine whether the damage was due to a covered peril and whether sales taxes on materials or labor necessary to make the covered repairs were properly calculated in the repair estimate. Again, these are inherently individual factual issues, which are not susceptible to class-wide inquiry or resolution.

Additional Living Expenses

As the trial court found, Additional Living Expense (ALE) under Coverage D |2t)Of the Lafayette policies are only available when an insured peril, here windstorm, is the cause of the damage to the insured property “and certain expense due to the displacement from the insured property at alternative living locations is necessary during the time when the insured premises were uninhabitable within the definitions and limits of the policy.” The plaintiffs contend Lafayette misadjusted their claims by systematically failing to *693 pay ALE when applicable. They assert a common issue that predominates, then, is whether Lafayette systematically denied ALE payments under Coverage D.[14]
The trial court found that, in the eight-parish geographical area, “the vast majority believe and the evidence supports a sequence, during and in the aftermath of the Hurricane, of strong hurricane force and often tornadic winds, lifting houses and boats, ripping off roofs, downing trees and power lines, followed by a surge of water causing the overtopping of levees and extreme flooding.” The trial court relied on the testimony of Larry Ingargio-la, the former Homeland Security Director for St. Bernard Parish, that only four homes were undamaged in the parish and only a handful of the parish’s residents were not displaced by the storm. The trial court | ^reasoned: “it is extremely difficult, in light of this pervasive damage and loss, to imagine that among all of the Defendant’s insured no Additional Living Expense was paid by Lafayette to its insured for additional living expenses under these circumstances.” Although the trial court conceded that displacement could have been caused exclusively by flood, Lafayette “made no attempt to apportion additional living expenses between those caused by wind or water.” The trial court added that, in any event, it was limiting the class to those persons who suffered wind damage to insured property in the geographic area.
The testimony at trial does not support a finding that common issues of fact exist with regard to ALE payments, nor does it support a finding that these common issues predominate over individual issues regarding ALE. As Lafayette argues, and the trial court acknowledged, the payment of ALE is based on the nature and scope of the damage to the insured’s property and the policy language. At the hearing, Baldwin, the plaintiffs’ public adjuster witness, testified no ALE was paid “except on maybe two” of the eleven claim flies he reviewed; however, he saw no indication in the files that Lafayette had instructed adjusters to uniformly deny ALE or that the denial of ALE in any particular claim was due to anything other than the primary adjuster’s inspection of the property. Kennel testified her father, Dupree, was not reimbursed for time away from his home. Barback testified he received no living expenses. Campos testified her family members had to stay away from their home due to damage, and they also did not receive living expenses. Dennis Juneau testified he witnessed roofs and trees flying during the storm, but he conceded he did not ask for living expenses because he had stayed with relatives after the storm; however, he believed he was owed living expenses because he had had *694 to pay for meals and had contributed to his relatives’ household expenses.
| S1 Lafayette produced evidence and testimony that the company paid out across the eight parishes $2,184,239.44 in Coverage D losses, including $157,226.64 of such losses in St. Bernard Parish. Coverage D losses consisted of both ALE and civil authority living expenses; however, Lafayette could not determine how much of this total amount is attributable to ALE or to civil authority living expenses absent a review of each claim. Elliott, who had worked for Crawford & Company, testified Lafayette did not instruct it or its adjusters to deny ALE. He explained that it was up to the independent adjuster to determine if the house was uninhabitable and the cause of the damage, whether wind or water. He explained Crawford adjusted Lafayette’s claims just as it had for any other client insurer. Finally, Helmick, who had' adjusted the Dupree claim, testified that, in his opinion, the Dupree home was uninhabitable due to flood, given that the water had risen above the roof line and possibly above the ridge of the roof, in light of the fact that a refrigerator was on top of the roof.
We find no common issues that predominate across the class with regard to ALE, which were paid to at least some of the putative class members. There is no dispute ALE was payable when applicable under the definitions and limits sections of the policies. As with the prior subclasses, the factfinder must determine the cause of the damage to each insured’s property, whether wind or water, in order to ascertain whether the damage to each is a covered peril. The factfinder will then be called upon to determine the extent of the damage from the covered peril, and whether the damage as a result of the covered peril rendered the insured’s property uninhabitable. As the record evidence demonstrates, the plaintiffs’ claims and, just as importantly, Lafayette’s defenses to those claims, will require individual proof of factual issues that are not suitable for class-wide resolution.

Civil Authority

lapThe Lafayette policy provided for civil authority living expenses as follows: “If a civil authority prohibits you from use of the ‘residence premises’ as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the additional living expense and Fair Rental Value loss as provided [ ] above for no more than two weeks.” The plaintiffs contend Lafayette misadjusted their claims by systematically failing to pay civil authority living expenses. They assert a common issue that predominates, then, is whether Lafayette systematically denied civil authority payments under Coverage D.
The trial court acknowledged that civil authority living expense “is very similar [to] or even considered a component of additional living expense,” yet “differs from traditional additional living expenses in that it covers living expenses when a civil authority prohibits the use of a residence as a result of direct damage to neighboring property although the insured home may not have been damaged by the insured peril.” In finding the plaintiffs had established a common issue, the trial court reasoned that, “in the event of the hurricane that neighboring properties were damaged by wind and the civil authority prohibited the occupancy or use of any residential property.” The trial court found Lafayette had not paid any claims under civil authority coverage. The court noted: “This benefit could have reimbursed certain expenses for a period not to exceed two weeks. The civil authorities set up barricades and restricted entry to all but emergency personnel during day *695 light hours and prevented anyone from occupying their home.” Implicitly finding the plaintiffs had demonstrated a common question predominating over individual claims, the trial court noted “some evidence indicates that adjusters did not even consider civil authority since they did not think it was covered by the policy.”
For the same reasons discussed above, we find the trial court erred in 1 .^concluding the record evidence establishes a common legal or factual question that predominates over individual claims for civil authority living expenses. The parties stipulated to the introduction of official evacuation orders, disaster declarations, and press releases regarding the eight parishes, except for St. Bernard Parish, which had not issued a mandatory evacuation order, according to Larry In-gargiola, the former Homeland Security director for the parish. Ingargiola testified no official order was issued either to evacuate before the storm or to prevent residents from returning after the storm; instead, residents were strongly encouraged to leave with the caution that the parish would “not have enough body bags to cover all of you all.” He stated that wind speeds exceeded 150 mph during the storm and that, from his vantage point at day break, he could see trees and power lines down. He testified that within half an hour after he had emerged from his location, the water began to come in. He stated that, a couple days after the storm, the parish set up barricades manned by sheriffs deputies at three of the four entrances to the parish, the fourth being the entrance from Plaquemines Parish. According to Ingargiola, no official order prevented return other than barricades, and some residents were allowed in through Paris Road. The witness believed the restrictions on access were necessary due to wind-related conditions that occurred before the flooding. He cited other reasons for not allowing unrestricted access: crime coming from New Orleans and the Murphy Oil spill. Baldwin, the plaintiffs public adjuster, testified civil authority was not paid on any of the eleven files he reviewed; however, he conceded he had not physically inspected any of the properties, had not spoken to any of the insureds, had not spoken to the primary adjusters, and had not reviewed flood maps, civil orders, or evacuation orders. On cross-examination, he affirmed he had seen nothing in the files indicating adjusters were instructed to deny uniformly civil authority living expenses; indeed, the files did l^not discuss civil authority.
Lafayette’s Miller testified that Coverage D payments, which included ALE and civil authority, were paid in lump sums in St. Bernard and the seven other parishes, although the company could not segregate the amounts paid for each without a review of each claim file. Miller explained that civil authority living expenses are not triggered by an evacuation order and that such payments are allowed only when there is actual damage to a neighboring property as a result of a covered peril. Miller testified, as with ALE, that it was the independent adjuster who made the physical inspection and determined the scope of the damage and whether the property was inhabitable or not. He stated Lafayette gave no instructions to the independent adjusters, leaving it to them as experienced adjusters and noting they could call the toll-free number if they had questions as to coverage. He conceded Dupree was not paid civil authority living expenses. Helmick, who had adjusted the Dupree claim, testified he had looked at the damage to Dupree’s neighboring structures, which he had determined suffered little wind damage. He explained he did not make the inspection of neighboring structures upon instructions from Lafay *696 ette, but did so in usual course as an adjuster. Further, he made no recommendation to Lafayette regarding civil authority. On cross-examination, Helmick admitted he had not thought civil authority was an included element under the policy. Elliott, the former Crawford supervisor, testified Crawford did not make recommendations on civil authority but instead forwarded all evacuation orders to Lafayette along with any information provided by the insured. Lafayette made the decision on civil authority, according to Elliott. The plaintiffs also introduced an email from an independent insurance agent indicating Lafayette had taken the position that ALE and civil authority would not be paid until an examination of the property was made and a [ .^determination was made that the property had been rendered uninhabitable by a covered peril.
As with ALE, we find no common legal or factual issues that predominate across the class with regard to civil authority living expenses. Lafayette did not dispute that civil authority living expenses were payable when applicable under the definitions and limits of the policies. The trial court apparently made blanket legal and factual determinations that civil authority living expenses were triggered by evacuation orders and general restrictions on access, that these evacuation orders and restrictions were the result of windstorm-related damages prior to the arrival of flood waters, and that windstorm damages had rendered homes in St. Bernard Parish uninhabitable prior to the arrival of flood waters. However, to determine whether a policyholder is entitled to civil authority, the factfinder must determine the cause or causes of the damages to the neighboring structures of each insured’s property, whether wind or water or some other cause, in order to ascertain whether the damages to the neighboring structures are the result of a covered peril. The factfin-der then will be called upon to determine the extent of the damages to the neighboring structures from the covered peril, whether the damages to the neighboring structures as a result of the covered peril rendered the insured’s property uninhabitable, and what length of time the insured’s property was rendered uninhabitable as a result of covered damages to the neighboring structures. Contrary to the trial court’s apparent conclusion, then, the plaintiffs’ claims for civil authority living expenses and Lafayette’s defenses to those claims will require individual proof of factual issues that are not suitable for class-wide resolution.

Failure to Timely Pay Claims

Lastly, the plaintiffs contend Lafayette misadjusted their claims, entitling them Isfito damages, penalties, attorney fees, and costs, by failing to pay claims within thirty or sixty days. In affirming class certification for statutory penalties, the trial court relied on two recent decisions from the court of appeal: Oubre v. Louisiana Citizens Fair Plan, 07-66 (La.App. 5 Cir. 5/29/07), 961 So.2d 504 (affirming class certification in action by policyholders against property insurer seeking penalties under La.Rev.Stat. 22:1220 for failure to initiate loss adjustment within thirty days after notice of hurricane damage), writ denied, 07-1329 (La.9/28/07), 964 So.2d 363; and Chalona v. Louisiana Citizens Property Ins. Corp., 08-0257 (La.App. 4 Cir. 6/11/08), 3 So.3d 494 (affirming class certification in action by policyholders against insurer seeking mandatory penalties under La.Rev.Stat. 22:658 for failure to offer timely to settle property claims arising from Hurricanes Katrina and Rita), writ application withdrawn.
We find these cases to be distinguishable on their facts. In Chalona, the plaintiffs alleged they had notified the defen *697 dant of their losses following Hurricanes Katrina and/or Rita, but the defendant failed to make a written offer to settle their property damage claims within thirty days, in violation of its statutory duty under La.Rev.Stat. 22:658(A)(4).[15] The Chalona plaintiffs sought statutory penalties pursuant to La.Rev.Stat. 22:658(B)(1).[16] The appellate court found the common question of |S7law or fact to be whether the defendant failed to provide the plaintiffs with written offers of settlement within thirty days as required by statute. The Chalona court’s apparent reasoning that commonality, as well as predominance and superiority, had been established by the plaintiffs was based primarily on the testimony of the chief executive officer of the defendant insurer, who admitted, as of the date of his deposition on December 1, 2005, that some eighty percent of the 59,-000 claims filed against the insurer remained outstanding and that only twenty percent of those filed claims had been concluded.[17]
In Oubre, the plaintiffs alleged they suffered damages to their property after Hurricanes Katrina and/or Rita, and notified the insurer of their losses, but the insurer failed to comply with its statutory duty under La.Rev.Stat. 22:658(A)(3) to initiate loss adjustment in a timely and adequate manner.[18] Therefore, they asserted, the insurer was liable for the statutory penalties provided in La.Rev.Stat. 22:1220.[19] *698 The ^appellate court found the evidence supported the trial court’s finding that a common factual question predominated as to whether the insurer had failed to initiate loss adjustment within the statutory thirty-day limit. The Oubre court likewise had noted the testimony of the chief executive officer of the same defendant insurer that as of December 1, 2005, the insurer had some 59,000 claims filed and eighty percent of those remained outstanding.
In the instant case, the plaintiffs seek statutory penalties under La.Rev.Stat. 22:658[20] and La.Rev.Stat. 22:1220(B)(5). The plaintiffs seek additional penalties under La.Rev.Stat. 22:1220(C). A cause of action for penalties under La.Rev.Stat. |m22:658 requires a showing that (1) an insurer has received satisfactory proof of loss, (2) the insurer fails to tender payment within thirty or sixty days of receipt thereof, and (3) the insurer’s failure to pay is arbitrary, capricious or without probable cause. See Louisiana Bag Co., Inc. v. Audubon Indem. Co., 08-0458, pp. 11-12 (La.12/2/08), 999 So.2d 1104, 1112-13. An insurer also owes a duty of good faith and fair dealing under La.Rev.Stat. 22:1220(A), and violates that duty if it fails “to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.” La.Rev.Stat. 22:1220(B)(5).
We recently explained that “an insurer need not pay a disputed amount in a claim for which there are substantial, reasonable, and legitimate questions as to the extent of the insurer’s liability or of the insured’s loss.” Louisiana Bag Co., 08-0453, pp. 16-17, 999 So.2d at 1116 (citing Reed v. State Farm Auto. Ins. Co., 03-0107 (La.10/21/03), 857 So.2d 1012, 1021). However, we noted, an insurer must pay any undisputed amount over which reasonable minds could not differ. Id. (citing McDill v. Utica Mut. Ins. Co., 475 So.2d 1085, 1092 (La.1985)). “Any insurer who fails to pay said undisputed amount has acted in a manner that is, by definition, *699 arbitrary, capricious or without probable cause, [Hammett v. Fire Ass’n of Philadelphia, 181 La. 694, 160 So. 302, 304-05 (1935)], and will be subject to penalties therefore on ‘the difference between the amount paid or tendered and the amount found to be due.’ ” Id., pp. 16-17, 999 So.2d at 1116 (quoting La.Rev.Stat. 22:658).
We find the trial court manifestly erred in apparently concluding the issue of statutory penalties in this case can be and is best resolved on a class-wide basis. La. Code Civ. Proc. art. 591(C) specifically mandates that certification “shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof Lpindividual to a member of the class.” Unlike the plaintiffs in Chalona and Oubre, the plaintiffs here have not introduced any evidence that Lafayette failed to initiate adjustment of their claims within thirty days of the notice of the loss or failed to make a written offer to settle their claims within thirty days after receipt of satisfactory proofs of loss. There was no testimony offered that Lafayette failed to do either. Instead, the plaintiffs assert Lafayette has misadjusted or denied their claims in violation of its statutory duties of good faith and fair dealing. As our discussion of the prior proposed subclasses reveals, the plaintiffs essentially assert the amounts they received were insufficient to satisfy their claims because Lafayette acted arbitrarily, capriciously or without probable cause in misadjusting their claims by using pre-Katrina pricing, by failing to pay adequate GCOP for roof repairs or replacement, by failing to pay for costs of permits and to pay correct sales taxes, by failing to pay ALEs, and by failing to pay civil authority living expenses. Given the nature of these claims against Lafayette, more than a simple calculation of damages must necessarily be made on an individual basis. Accordingly, whether Lafayette is liable to the plaintiffs for statutory penalties, because it breached the contract with the policyholder and/or breached its duty of good faith and fair dealing, will necessarily require intensive review of the individual facts of each putative class member’s damage claim, which under these circumstances are not suitable for resolution on a class-wide basis.[21]

Predominance and Superiority

In addition to the commonality prerequisite, we find the trial court manifestly 141 erred in finding that common factual or legal issues predominate over individual questions and that a class action is superior to other available methods for the fair and efficient adjudication of the plaintiffs’ claims. La.Code Civ. Proc. art. 591(B). As discussed above, individual liability issues and defenses thereto predominate over any common issues, none of which we found to be substantive. Whether the plaintiffs had homeowner policies with Lafayette and suffered wind damage as a result of Hurricane Katrina are not sufficiently substantive issues militating in favor of class certification.
Nor have the plaintiffs established that the class action is superior to other methods under these circumstances. We stressed in Brooks that “the trial court must evaluate, quantify and weigh the relevant factors to determine to what extent the class action would in each instance *700 promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness.” Brooks, 08-2035, p. 10, 13 So.3d at 554. The basic goal or aim of any procedural device is “to implement the substantive law, and to implement that law in a manner which will provide maximum fairness to all parties with a minimum expenditure of judicial effort.” Stevens v. Bd. of Trustees of Police Pension Fund of City of Shreveport, 309 So.2d 144, 151 (La.1975).
As noted above, the legislature has since codified the considerations it deemed pertinent to such an analysis in La. Code Civ. Proc. art. 591(B)(3). With regard to “the interest of the members of the class in individually controlling the prosecution or defense of separate actions,” La.Code Civ. Proc. art. 591(B)(3)(a), we find the claims are so highly individualized that class certification likely will be unfair to members who have claims stronger than the named representatives. As this court has noted, the requirements of predominance and superiority mandate “caution, especially Lswhere individual stakes are high and disparities among the class members great.” Brooks, 08-2035, p. 19., 13 So.3d at 560. Also militating against class certification is the fact that individual suits raising similar insurance adjusting claims have already been filed widely — and many have been resolved — with respect to damages arising out of Hurricane Katrina, as Lafayette’s representative attested to and the trial court itself acknowledged. Because we find no common substantive issues exist among the putative class members in this case, and the merits of each claim will turn on individual proof of liability, the extent and nature of the litigation already commenced by putative class members do not suggest class certification will add to fairness and efficiency. La. Code Civ. Proc. art. 591(B)(3)(b).
Next, there has been no showing that concentrating the litigation in St. Bernard Parish is more desirable over other fora and that it contributes to fairness and efficiency. La.Code Civ. Proc. art. 591(B)(3)(c). Indeed, we note that, aside from the St. Bernard Parish residents, residents of the remaining seven parishes in the putative class will be required to present and prove their highly individual damage claims outside of their home parishes, and there has been no discussion, much less proof, that requiring these class members to litigate their claims in another forum is preferable to litigating in their home forum. As we have concluded, no common factual or legal issues exist that would militate in favor of having the plaintiffs’ claims adjudicated in a single forum.
Nor do we find the difficulties in managing a class action will be outweighed by a gain in efficiency in adjudicating the controversy. La.Code Civ. Proc. art. 591(B)(3)(d). As discussed in detail above, the individual claims are such that the class action would necessarily devolve into a series of mini-trials on the liability of Lafayette with respect to each putative class member. The plaintiffs have also not | ^demonstrated they lack the practical ability to pursue their claims without class certification. La.Code Civ. Proc. art. 591(B)(3)(e). Although they contend some claims are so small the policyholder might be discouraged from filing suit on his or her own, we note the plaintiffs are also seeking statutory damages and penalties under La.Rev.Stat. 22:658 and 22:1220, which provide for minimum penalties of $1,000 and $5,000 if the factfinder determines they are merited. Moreover, the plaintiffs have not shown the trial court cannot manage similar cases efficiently under the rule of joinder and the cumulation of actions. See La.Code Civ. Proc. arts. 461 et seq.
*701 Finally, we do not find the vindication of public policies or legal rights justifies the costs and burdens of class litigation. La. Code Civ. Proc. art. 591(B)(3)(f). As we have noted, proof that Lafayette breached its duties of good faith and fair dealing and acted arbitrarily, capriciously and without probable cause will require an intensive review of the facts individual to each putative class member. The burdens on Lafayette of defending such claims in a class action would be substantial, and in our view, unwarranted in light of legislative policy that class certification “shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class.” La.Code Civ. Proc. art. 591(C). “When there are a myriad of individual complaints that ultimately will require plaintiff-by-plaintiff adjudication of liability issues, this will militate against a finding of predominance of common character and the superiority of the class action procedure.” Davis v. Jazz Casino Co., L.L.C., 03-0005 (La.App. 4 Cir. 1/14/04), 864 So.2d 880, 889 (citing Banks, supra, 737 So.2d at 1281), writ denied, 04-0572 (La.4/23/04), 870 So.2d 304.[22]
| ^CONCLUSION
For the reasons set forth above, we conclude the trial court manifestly erred in finding common factual or legal issues exist as required by La.Code Civ. Proc. art. 591(A)(2). The trial court also erred in finding, under La.Code Civ. Proc. art. 591(B)(3), that common substantive issues of law or fact predominate over individual questions and that the class action procedure is superior to other available methods for fairly and efficiently adjudicating the claims asserted. Accordingly, we conclude the trial court abused its discretion in certifying the class. We therefore reverse the appellate court’s judgment affirming the trial court’s class certification, reverse the trial court’s ruling granting the motion to certify the class, and remand the case for further proceedings.
REVERSED AND REMANDED.
JOHNSON, J., concurs in part, dissents in part and assigns reasons.

 Retired Judge Philip C. Ciaccio, appointed Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. During the course of the litigation, Mr. Du-pree died and his daughter, Gena Dupree Kennel, was substituted as a named plaintiff.

. Jason and Shontel Campos testified at the hearing on the class certification, but the record does not show whether they were added in a supplemental and amending petition as class representatives.

. In response to Lafayette’s unsuccessful motion for summary judgment, the plaintiffs agreed the class could be limited to those property owners in the parishes of St. Bernard, Plaquemines, Orleans, St. Tammany, Jefferson, St. Charles, Tangipahoa, and Terre-bonne, and the class was eventually so limited by the trial court.

. Neither party has assigned error in the court of appeal’s instructions with regard to this particular clause.

. Before their amendment in 1997, La.Code Civ. Proc. arts. 591-597 were modeled after Fed. Rule Civ. Proc. art. 23 as originally enacted. Banks, 98-0551, p. 7, 737 So.2d at 1280. After the federal rule was amended in 1966, Louisiana courts used the factors set forth in the amended version of Rule 23(b) as guidelines to determine whether to allow a class action, along with those judicially recognized. Id. (discussing Stevens v. Bd. of Trustees of Police Pension Fund, 309 So.2d 144, 150-51 (La.1975), and Ford, 96-2913, 703 So.2d at 547-48). The revision, according to one commentator, both expanded and contracted the availability of the class action procedure. See Frank L. Maraist, 1 Louisiana Civil Law Treatise: Civil Procedure, § 4.12, p. 101 (2d ed.2008). The revision of Art. 591, when compared to the federal rule, confirmed the prerequisites of numerosity, commonality, typicality, and adequacy of the representative, added the requirement of an objectively definable class, and specified four types of class action, as set forth in Art. 591(B). Id. The revision of Art. 591 also adds two “matters pertinent” for determining predominance and superiority not found specifically in the federal rule. See La.Code Civ. Proc. art. 591B(3)(e) and (1).
Fed. Rule Civ. Proc. 23 provides in pertinent part:
(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class, (b) An action may be maintain as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
[[Image here]]
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

. Art. 591(B)(1) and (2) provide that a class action may be maintained only if:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(a) Inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class, or
(b) Adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of other class members not parties to those adjudications or would substantially impair/impede their ability to protect those interests, or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....
Although plaintiffs in their brief suggest they alternatively satisfied Art. 591(B)(1), the trial court did not issue its class certification order under either paragraph of Art. 591(B)(1). Furthermore, the class types set forth in Art. 591(B)(1) and (2) are considered "non-opt out classes," which was not the type of class requested or intended by the plaintiffs or the trial court. See Maraist, 1 Louisiana Civil Law Treatise: Civil Procedure, § 4.12, pp. 102-03.
As discussed in Allison v. Citgo Petroleum Corp., 151 F.3d 402 (5th Cir.1998), class certification under Fed. Rule 23b(1)(a), which is equivalent to La. Code Civ. Proc. art. 591(B)(1)(a), is generally not appropriate for individualized damage claims seeking primarily monetary damages. The Allison court noted: "Given the individual-specific nature of the plaintiffs’ claims for compensatory and punitive damages, we perceive no risk of inconsistent adjudications or incompatible standards of conduct in having those claims adjudicated separately.” 151 F.3d at 421 n. 16 (emphasis in original). The plaintiffs here have not requested a uniform monetary remedy, nor have they alleged an entitlement to any type of class-wide recovery.
Similarly, class certification is not appropriate under Art. 591(B)(1)(b), which is equivalent to Fed. Rule 23(b)(1)(b), because the plaintiffs’ claims do not raise the issue of a limited resource or fund from which their damages would be allocated. See In re: Asbestos Litig., 134 F.3d 668, 672 n. 7 (5th Cir.1998)(only where the class members’ interests are mutually exclusive will the individuals’ litigation substantially impair the others’ rights); see also Doiron v. Conseco Health Ins. Co., 240 F.R.D. 247, 255 (M.D.La.2007) (denying certification under Rule 23(b)(1)(b) where the proposed class did not raise the type of issues traditionally sought in 23(b)(1)(b) class actions, such as a limited fund).
Art. 591(B)(4) applies to a "settlement class action,” which permits a court to certify an Art. 591(B)(3) class action for settlement purposes, even though the specific requirements of Art. 591(B)(3) have not been met. La.Code Civ. Proc. art. 591(B)(4); see also Maraist, pp. 103-04.

. As we noted in McCastle, 456 So.2d at 616, the basic requirements for a class action, as set forth in the pre-1997 versions of Arts. 591 and 592, were as follows:
1. A class so numerous that joinder is impracticable, and
2. The joinder as parties to the suit one or more persons who are
(a) members of die class, and
(b) so situated as to provide adequate representation for absent members of the class, and
3.A "common character” among the rights of the representatives of the class and the absent members of the class.

. The plaintiffs counter that these federal cases are not binding on this Louisiana court, particularly because the Louisiana class action rule differs in part from the federal rule. While this court agrees the federal cases cited by the defendant are not directly binding on this court as to a particular result in this case, the reasoning in those federal cases remains relevant where the Louisiana rule tracks the federal rule. As our prior decisions in this area make clear, this court has historically reviewed the federal rule and federal jurisprudence in analyzing class certifications in Louisiana; indeed, our legislature has on more than one occasion adopted the federal class action rule, albeit most recently with some additional considerations developed from the jurisprudence. See Brooks; Ford. Accordingly, to the extent that revised La.Code Civ. Proc. art. 591 parallels Fed. Rule 23 regarding class actions, our class certification analysis will continue to be informed by federal jurisprudence interpreting Rule 23.

. Reed did not testify at the hearing.

. Kelly did not testily at the hearing; however, Drennan discussed Kelly’s qualifications at Drennan’s deposition. Drennan knew Kelly had a high school diploma and had a number of years of experience in estimating repairs. Drennan admitted Kelly did not have specific training, as far as he knew, in estimating costs or determining wind versus water damage. Kelly prepared all the repair and cost estimates for Drennan.

. Lafayette had four different homeowner policies: HO-2 is a named peril broad form for someone who owns and resides in their home; HO-3 is an all peril policy which includes additional perils not found in HO-2; HO-4 is a named peril policy for someone who does not own the property; and HO-6 is for a condominium unit. About 3,500 to 4,000 policies were HO-2, and about 8,000 policies were HO-3.

. Lafayette also introduced the results of a statewide market study performed by the Louisiana Department of Insurance on the claims handling practices of Lafayette following Hurricanes Katrina and Rita. The purpose of the study was "to insure equitable treatment of Louisiana policyholders and claimants by the Company and to assure compliance by the Company with Louisiana statutes, rules, directives, bulletins and regulations, as well as the Company's own procedures and guidelines.” Exhibit D7. Lafayette asserts this study establishes that its adjusting practices were generally in compliance with Louisiana law and the company's own guidelines. It is uncertain what weight, if any, the trial court gave to this evidence.

. Press v. Louisiana Citizens Fair Plan Property Ins. Corp., 08-1313 (La.App. 4 Cir.4/22/09), 12 So.3d 392, writ denied, 09-1125 (9/4/09), 17 So.3d 967, is distinguishable from the instant case. In Press, the appellate court found the common issue that predominated was whether an insured was entitled to GCOP when the adjustment identifies three or more trades involved in the repairs to the damaged property. 08-1313, p. 5, 12 So.3d at 396. Because there was testimony from two claims supervisors that none of the claims they supervised, some 6,600 to 8,000 claims, included GCOP, the appellate court found a common issue existed as to whether GCOP was payable and should have been paid under the *692 insurer’s own policies and guidelines. In the instant case, there was no dispute that GCOP was allowed under the policy when applicable, i.e., when multiple trades were required to make the covered repair; furthermore, the record evidence demonstrated that GCOP was in fact paid to Lafayette's policyholders, including the named representatives. Thus, the factual disputes presented by the plaintiffs here turn on whether the policyholder’s roof was damaged by a covered peril, whether the roof required complete replacement or could be repaired, and whether the roof repair or replacement was such that it was reasonably likely a general contractor would be necessary to make the covered repairs.

. The policy provided as follows:
COVERAGE D-Loss of Use
1. If a loss covered under this Section makes that part of your "residence premises” where you resided not fit to live in, we cover, at your choice, either of the following. However, if the "residence premises” is not your principal place of residence, we will not provide the option under paragraph b below:
a. Additional Living Expense, meaning any necessary increase in the living expenses incurred by you so that your household can maintain its normal standard of living, or
b. Fair Rental Value, meaning the fair rental value of that part of the “residence premises” where you reside less any expenses that do not continue while the premises is not fit to live in.
Payment under a or b will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time for your household to settle somewhere else.

. La.Rev.Stat. 22:658(A)(4) (2003) provides in pertinent part:
All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.

. La.Rev.Stat. 22:658(B)(1) (2003) [revised and now found in La.Rev.Stat. 22:1892] provides:
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.

. Two judges dissented, believing the definition of the proposed class was insufficient to allow a policyholder to determine whether he or she might be a putative class member. See Chalona, 08-0257, 3 So.3d at 504 (Murray, J., and Kirby, J, dissent with reasons).

. La.Rev.Stat. 22:658(A)(3) (2003) provides in pertinent part:
.... In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1220 [now found in La.Rev.Stat. 22:1973],

. La.Rev.Stat. 22:1220, now found in La. Rev.Stat. 22:1973, "Good faith duty; claims settlement practices; cause of action; penalties,” provides in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an *698 insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
(3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
(4) Misleading a claimant as to the applicable prescriptive period.
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
(6) Failing to pay claims pursuant to R.S. 22:658 [now found in formerly La.Rev.Stat. 22:1892] when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

. In addition to the provisions provided above, La.Rev.Stat. 22:658(A)(1) (2003) provided, in pertinent part:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Tide 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.

. We note also that it is within the factfin-der’s discretion whether to impose additional penalties under La.Rev.Stat. 22:1220, including subsection (C), and thus whether Lafayette is liable for such additional penalties will require an individual examination of Lafayette's conduct with regard to each policyholder. See generally Sultana Corp. v. Jewelers Mut. Ins. Co., 03-0360 (La.12/3/03), 860 So.2d 1112; Calogero v. Safeway Ins. Co. of Louisiana, 99-1625 (La.1/19/00), 753 So.2d 170.

. When it suggested the trial court on remand should excise the "when such is arbitrary, capricious or without probable cause” language from the class definition, the appellate court recognized that the plaintiffs, to be awarded statutory penalties, must necessarily establish Lafayette acted arbitrarily, capriciously or without probable cause when it misadjusted or denied their claims. Although the appellate court acknowledged that "the determination of whether an insurer’s failure to pay was arbitrary and capricious must be made at trial and goes to the merits of each individual claim,” Dupree, 09-0321, p. 14, 41 So.3d at 495, the court neglected to determine whether "the disallowance of individual trials” by certifying the class is "warranted by a subjective gain in efficiency” in judicial administration over some other available procedure. Daniels v. Witco Corp., 03-1478 (La.App. 5 Cir. 6/1/04), 877 So.2d 1011, 1015-16, writs denied, 04-2283 (La.11/19/04), 888 So.2d 204, and 04-2287 (La.11/19/04), 888 So.2d 205.