DARNETTE DANIELS, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILD, TAYLER MCCLENDON

VERSUS

STATE OF LOUISIANA, BOARD OF ELEMENTARY AND SECONDARY EDUCATION, ORLEANS PARISH SCHOOL BOARD, NEW BEGINNINGS SCHOOLS FOUNDATION, AND TENSQUARE, LLC

\*　　NO. 2024-CA-0833

\*　　COURT OF APPEAL

\*　　FOURTH CIRCUIT

\*　　STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-06895, DIVISION "B"
Honorable Marissa Hutabarat,
\* \* \* \* \* \*
**Chief Judge Roland L. Belsome**
\* \* \* \* \* \*

(Court composed of Chief Judge Roland L. Belsome, Judge Rosemary Ledet, Judge Nakisha Ervin-Knott)
**LEDET, J., CONCURS IN THE RESULT.**
**ERVIN-KNOTT, J., CONCURS IN THE RESULT.**

Suzette P. Bagneris
Emile A. Bagneris, III
THE BAGNERIS FIRM, LLC
1929 Jackson Avenue
New Orleans, LA 70113
　　COUNSEL FOR PLAINTIFF/APPELLEE

Claudia C. Wimberly
Peter Stephan Koeppel
Natasha Z. Wilson
Michael A. Triay
Chad P. Favre
KOEPPEL, LLC
2030 St. Charles Ave.
New Orleans, La 70130
　　COUNSEL FOR DEFENDANT/APPELLANT

SEPTEMBER 16, 2025
AFFIRMED

RLB

New Beginnings School Foundation ("NBSF") and its insurers (collectively, "Appellants") appeal the July 17, 2024 judgment of the trial court certifying and defining a group of claimants as a class and approving class representatives and counsel. This class action is brought to address claims of certain students of John F. Kennedy High School ("Kennedy"), their parents and guardians (referred to herein as "Appellees"). Appellees allege that they suffered damages that were caused by fraud, negligence, and gross mismanagement of the educational process at the school. Although other defendants were named in the original petition, all were dismissed[1] except Appellants. For reasons that follow below, we affirm the trial court's judgment.

**PROCEDURAL HISTORY AND STATUS**

The original petition in this case was filed July 1, 2019. Appellees amended and supplemented the original petition three times. In the original and all amending petitions, Appellees asserted that the NBSF's gross mismanagement of Kennedy High School caused them a variety of damages. In particular, the petition (as amended) alleges that NBSF failed to maintain staff and teachers; overused

---

[1] Original defendants, Orleans Parish School Board, Louisiana Department of Education, and TenSquare, L.L.C. were dismissed voluntarily by Appellees prior to the trial of the motion for class certification.

1

substitute teachers; mismanaged school finances; falsified contracts that affected school operations; failed to learn the policies and practices of the Louisiana Department of Education ("LDE") regarding successful matriculation from high school; negligently provided students with incorrect information regarding graduation credits; and misused a computer-based learning program titled "GradPoint"[2] in a manner that disqualified students from getting course credits even when they completed the assigned work. At the trial of the motion for class certification ("the Trial"), evidence was offered that NBSF personnel had falsified student records and misled auditors who were sent by the Orleans Parish School Board ("OPSB") and the LDE to investigate the same complaints made by Appellees.

The Trial was conducted over the course of six days. Appellants contested the certification on every prerequisite set forth in La. C.C.P. art. 591. After the Trial, the parties submitted memoranda. The class, as certified by the trial court, was defined as:

> Those persons who were either a parent/legal guardian of a student, or a student who attended John F. Kennedy High School at Lake Area in New Orleans during the 2018-2019 school year, and were either (a) a member of the Class of 2019 or (b) a member of the Class of 2020, who claim to have suffered damages as a direct and proximate result of New Beginnings School Foundation's management and operation of Kennedy.

The class certification judgment named five individuals who fit the definition above as class representatives.

---

[2] GradPoint is a program designed to permit students to quickly retake a course in which they had previously failed. The program rules require the presence and supervision of an accredited teacher during times when the student is studying and testing. Appellees alleged that the students were not informed of this requirement and that the students who used the program were not supervised by their teachers.

On this appeal, Appellants contest the creation and definition of the class as created by the district court.

**APPELLATE REVIEW STANDARD**

A judgment certifying a class necessarily combines findings of fact and conclusions of law. "The standard of review for class certification is bifurcated: factual findings are reviewed under the manifest error/clearly wrong standard, but the trial court's judgment on whether to certify the class is reviewed by the abuse of discretion standard." *Robert v. State through Governor Division of Administration*, 2023-0397, p.6 (La. App. 4 Cir. 12/6/23), 381 So. 3d 715, 723 (citations omitted). In making these determinations, the court must be guided by the principle that the sole issue for determination is whether class action is the proper procedural device. An appellate court may not consider whether plaintiffs are likely to prevail on the merits of their claims. That calculation is irrelevant to the creation and definition of a class of litigants. *Id*. We are also instructed that:

> Any errors to be made in deciding class action issues should be in favor of and not against the maintenance of the class action, because a class certification order is *always* subject to modification or decertification, "if later developments during the course of the trial so require." *McCastle,* 456 So.2d at 620. To that end, La. Code. Civ. Proc. art. 592(A)(3)(d) provides the trial court "may alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action." La. Code. Civ. Proc. art. 592(A)(3)(d). Nonetheless, the trial court should evaluate the case closely before certifying the class in light of the consequent burdens of giving notice and additional discovery. *See Dupree,* 09–2602 at p. 7, 51 So.3d at 680.

*Baker v. PHC-Minden, L.P.,* 2014-2243, p.11 (La. 5/5/15), 167 So. 3d 528, 537–38 (emphasis in original).

3

**THE TRIAL COURT'S FINDINGS OF FACT**

We begin our review with a summary of the most pertinent facts found by the trial court.

NBSF is a private, Louisiana non-profit corporation that contracted with the OPSB to operate Kennedy as permitted by La. Rev. Stat.§ 17:3971, *et seq*. As early as the 2015-2016 school year, when members of the graduating class of 2019 were still freshmen, NBSF and Kennedy school administrators knew that some issues would hamper some students from graduating timely. Kennedy guidance counselor, Ashlei Delarge ("Ms. Delarge") conducted a school-wide audit of students and graduation requirements. Ms. Delarge's audit revealed that: (1) a significant number of students were missing core curriculum requirements; (2) some students who had transferred into Kennedy were missing transcripts; (3) some students had either failed to pass required classes or had not taken the end-of-class exam; (4) student data was not transferred to the new system when Kennedy changed software during the 2015-2016 school year; (5) NBSF created student class schedules without assessing the individual needs of the students regarding course offerings each year; (6) NBSF made frequent administrative personnel changes that hindered the process of following up plans to address the matriculation issues, which intensified the on-going scheduling and course offering issues; and (7) the administration routinely used GradPoint instead of full course offerings[3] to meet students' core curriculum requirements.

NBSF appointed a new Chief Executive Officer ("CEO") and a new principal at Kennedy at the beginning of the 2017-18 school year. Both new

---

[3] As noted above, GradPoint was designed for use by students who had already taken and failed the full course offering. NBSF improperly used it as a substitute for taking the full course in the first instance.

administrators were informed of the ongoing matriculation issues. They were provided with student transcripts and copies of the spreadsheet that summarized the results of Ms. Delarge's audit. The spreadsheet showed deficiencies in graduation eligibility for a significant number of students in the classes of 2019, 2020, 2021 and 2022. Administrators were also given a document entitled "Ninth to Twelfth Grade Tracker" that was created to show the numerous deficiencies in student progression towards graduation eligibility. At the beginning of the 2018-19 school year administrators were advised again of the ongoing deficiencies in students' graduation eligibility for students who anticipated graduating at the end of the 2019 through 2022 school years.

In April 2019, NBSF terminated its CEO. While NBSF searched for a replacement, it hired TenSquare[4] to act as CEO under the terms of a consulting agreement. TenSquare soon learned it would not be able to determine whether a substantial number of Kennedy's seniors would be eligible for the graduation that was anticipated in the next month. In addition to the deficiencies noted in the earlier audit, TenSquare became aware that (1) Kennedy had insufficient certified teachers for core curriculum classes; (2) no "Pupil Progression Plan" for students and incomplete or non-existent "Individual Graduation Plans;" (4) no alternative graduation pathways offered other than the university pathway; (5) grades that were inappropriately modified to improve student scores; and (6) end-of-course testing irregularities.[5]

---

[4] TenSquare,L.L.C. ("TenSquare") is a national organization that provides support to charter schools, charter management organizations, state departments of education and local school districts.

[5] The trial court found, as fact, other irregularities. The list here is not exhaustive, but illustrative.

TenSquare initiated a project entitled "Senior Graduation Project" to determine the graduation eligibility of the 178 members of the senior class. Despite their efforts in the 30 days leading up to the May 17, 2019 graduation date, TenSquare personnel could not identify which students were eligible to graduate nor could it establish their class rank. The trial court pointed out emails from TenSquare to NBSF expressing concerns about moving forward with the pseudo-graduation ceremony and with naming Trinity Barnes (one of the Appellees) as valedictorian. Without regard to TenSquare's trepidation, NBSF moved forward with the graduation ceremony. One hundred fifty-five students participated in the ceremony, but no diplomas were issued. After the staged graduation ceremony, NBSF sent letters to all Kennedy student families notifying them of the irregularities in the school and their impact on actual graduation. On May 28, 2019, NBSF held a public board meeting with parents and students to address the same issues.

About the same time, TenSquare alerted LDE about the irregularities at Kennedy, including the alleged improper grade-changing and the uncertainty surrounding the graduation ceremony that had gone forward without regard to students' eligibility to graduate. By a letter dated May 31, 2019, LDE informed NBSF that it would audit all student records for the Class of 2019. LDE began its audit while TenSquare was still working to determine graduation eligibility. LDE's audit discovered that 70 of the 155 students who participated in the graduation ceremony were ineligible to graduate as of that time. Students were required to complete any outstanding graduation eligibility requirements by August 31, 2019.

TenSquare and NBSF developed individual graduation plans for the 70 initially ineligible students. NBSF opened a summer school to provide appropriate classes for the students. Twenty-three of 70 "ineligible" students did not complete the requirements by August 31 and could not graduate as members of the class of 2019.[6]

Completion of the LDE audit delayed issuance of diplomas and transcripts to the students. Those delays hampered college applications for affected students. The audit confirmed that NBSF administrators had altered grades improperly. LDE also learned from its audit that problems that obstructed the class of 2019 would continue to impact the Kennedy graduating classes of 2020 and 2021.

LDOE also directed NBSF to create a "Pupil Progression Plan" before the 2019-2020 school year began to ensure that underclassman had a clear path to graduation. Eventually, the NBSF Board voted to relinquish its charter for Kennedy, acknowledging that such action was in the best interests of students and parents.[7]

**LA. C. C. P. ART. 591(A) CONSIDERATIONS**

"To maintain a class action suit, the plaintiff has the burden of proving that the action satisfies every one of five threshold statutory prerequisites of numerosity, commonality, typicality, adequate representation and definability."[8]

---

[6] Defendants argued that some of the 23 students who did not graduate had failed to take classes that were offered. That argument is without merit because class schedules were made by NBSF employees, not the students themselves. Both parties agree that some of the 23 students did not graduate because they failed required classes.

[7] OPSB had already taken steps to revoke NSFB's charter at the time NSFB relinquished it.

[8] The prerequisites for the maintenance of class actions according to La. C.C.P. art. 591 are:
A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that joinder of all members is impracticable.
(2) There are questions of law or fact common to the class.

The trial court considered the evidence presented at the Trial and found that Appellees had proven all factors. Below, we review each factor in order to determine whether the trial court abused its discretion.

## *NUMEROSITY*

If the number of separate suits would "unduly burden the courts. . . a class action would be more useful and judicially expedient than any other available procedures." *Galjour v. Bank One Equity Inv'rs-Bidco, Inc.*, 05-1360, p. 13 (La.App. 4 Cir. 6/21/06), 935 So.2d 716, 726. In *Doe v. S. Gyms, L.L.C.*, 12-1566, p. 12 (La. 3/19/13), 112 So.3d 822, 831, our Supreme Court enumerated components of numerosity developed by continuing jurisprudence:

> Although not as well-developed or relied on as the preceding guidelines, various other factors have developed in the jurisprudence for determining the practicality of joinder of a large number of potential class members, including: (1) the geographic dispersion of the class; (2) the ease with which class members may be identified; (3) the nature of the action; (4) the size of the individual claims; (5) judicial economy in avoiding a multiplicity of lawsuits; and (6) financial resources of class members. We find these factors may also inform a district court's determination whether the proposed class has a sufficient number of members so that joinder is impracticable.

The *Galjour* factors provide guidance to us in determining whether the claims are "so numerous that joinder of all members is impracticable" as required by art. 591. While those factors provide guidance, we need not find that the case before us factually meets every test. Appellants have argued that Appellees failed to present evidence sufficient to satisfy any of these factors. Among Appellees' arguments, the only one that carried sufficient weight to merit discussion here is

---

(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.

whether the plaintiff class is so geographically dispersed as to make their joinder impracticable.[9] In other respects, the class, as defined, meets the prerequisite of numerosity.

The central fact on which Appellants base their argument is that all the graduate plaintiffs were domiciled in Orleans Parish at the time of NBSF's allegedly wrongful acts. Further, they point to the trial court's Reasons for Judgment in which the judge noted that dispersion is shown by the fact that two of the class representatives lived out of state and testified via Zoom.

The reasoning of our court in *Galjour* is instructive in the instant case. In *Galjour*, shareholders of a corporation sued the corporation and members of management for fraud and breaches of fiduciary duty. The court held that the names and addresses of all affected shareholders could be determined by reference to the corporate records. In addition, the plaintiffs in that case acknowledged that all the potential class members lived in South Louisiana and nearly all had been contacted at the time of the class certification hearing.

We agree with the trial court's determination. It is true that the domicile of the two foreign class representatives is not dispositive of class dispersion. However, we find no merit in the argument that all the graduates were domiciled in Orleans Parish during the relevant time period. Five years have passed since the 2019 graduation, and it is likely that a significant number of class members now live in foreign jurisdictions. Unlike the facts in *Galjour*, the locations of the 2019 class cannot be determined by reference to their domicile at the time of the 2019 graduation exercise. Adding to Appellees' difficulty of proving dispersion of class

---

[9] The other *Galjour* factors overlap, factually and legally, with the requirements of La. C.C.P. art. 591(B) which are discussed more fully below.

members is the fact that NBSF has failed to deliver student records to Appellees' counsel, notwithstanding outstanding discovery requesting those records. The record reveals that this failure has been the subject of a motion to compel discovery filed by Appellees in the trial court.

### *COMMONALITY*

Commonality refers to questions of law or fact common to the class. *La. C.C.P. art. 591.* "In order to meet the common case requirement, each member of the class must be able to prove individual causation based on the same set of operative facts and law that would be used by any other class member to prove causation." *Price v. Martin*, 10-599, p. 9 (La.App. 3 Cir. 2/2/11), 56 So.3d 1109, 1116. "[T]he mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove their right to recover does not preclude class certification." *Bartlett v. Browning–Ferris Indus. Chem. Serv., Inc.,* 99–494, p. 3 (La. 11/12/99), 759 So.2d 755, 756.

The trial court found that an audit by the LDE found myriad deficiencies, irregularities, organizational gaps and deceptions in the management and supervision of student graduation eligibility at Kennedy, all of which violated the charter agreement, BESE and OPSB policies. Grades had been tampered with, courses were being taken by the administrators "in lieu of providing actual classes for a number of students." There was a widespread lack of adherence to the State's Pupil Progression Plan ("PPP") and Independent Graduation Plans ("IGP")[10] for all

---

[10] PPPs and IGPs are both required documents that schools must prepare to track students' progress from grade to grade and to graduation respectively. These documents are designed by the LDE to ensure that students are progressing optimally through their course work and that they will complete all work necessary to graduate in four years.

grade levels. According to LDE's investigation, the majority of the student body was guided to take non-foundational courses that "were not relevant to their graduation pathway," as well as "course loading." Seniors were provided with the wrong course work in summer school. Students (and parents) were given no option to select a graduation route. They were solely enrolled in the TOPS/University Diploma option.[11]

The product of the issues above clearly created damages that arose from the same nucleus of common facts and questions of law from one source. The causative link between the NBSF's conduct and the class member's injuries was the same for all Appellees despite ranging in their "degree of damages."[12]

### *TYPICALITY*

"Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Baker v. PHC-Minden, L.P.*, 14-2243, p. 21 (La. 5/5/15), 167 So.3d 528, 543. "A plaintiff's claim is typical if it arises out of the same event, practice, or course of conduct giving rise to the claims of the other class members and those arise from the same legal theory." *Id*. "The representatives' claims need not exhibit all the various types of possible injuries or elements of damages claimed by the class as a whole." *Allen v. Edwards*, 19-0125, p. 15 (La.App. 1 Cir. 3/12/21), 322 So.3d 800, 811.

---

[11]At the time, the State of Louisiana used three diploma pathways: TOPS University Diploma; Jump Start (Career Diploma) and TOPS Tech Career Diploma. Students should be offered an opportunity to select a pathway as part of individual Graduation Plans.

[12]The damages alleged include "genuine and severe emotional distress and/or economic losses as a direct result of a common course of conduct, i.e., educational malpractice or negligence, negligent hiring, retention and supervision of administrators and staff, and intentional grade changing, misrepresentation, fraud. . . ."

As Ms. DeLarge testified:

Q. And would you agree that there were many different reasons why students weren't eligible to graduate?

A. There were many different reasons.

Q. And so ...

*A. But they all came back to the same thing: Adults failed them. . .*

Q. Was it the adults' responsibility to make sure those things took place before any of those students were certified eligible to graduate?

A. Correct.

Class members would be seeking damages that occurred as a result of the actions of one school that was overseen by NBSF. The students and families may have come from different backgrounds, but they all experienced injuries as a result of the practices and policies that occurred at Kennedy. The trial court did not err in this determination.

### *ADEQUACY OF REPRESENTATION*

The purpose of the adequacy requirement is to protect the legal rights of the unnamed class members. ... The test often used for adequate representation consists of three elements: (1) the chosen class representatives cannot have antagonistic or conflicting claims with other members of the class; (2) the named representatives must have a sufficient interest in the outcome to insure vigorous advocacy; and (3) counsel for the named plaintiffs must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously.

*Duhe v. Texaco, Inc.*, 1999-2002 (La. App. 3 Cir. 2/7/01), 779 So. 2d 1070, 1079.

The trial court found that the parents and students proposed as class representatives fairly and adequately protect the interests of the class. Parents, Darnette Daniels and Kena Ross, and students, Tayler McClendon, John Ross, and Trinity Barnes, shared consistent and credible testimony about the emotional and academic hardships caused by NBSF's failures. They spoke of graduation and transcript delays; negative impacts on college or job opportunities; mental health

12

challenges; and a sense of stigma for belonging to the Kennedy graduating classes of 2019 and 2020. The claims described by their testimony is typical of the class as the trial court defined it. There is no indication that any of the proposed representatives had claims of a nature that would make them legally antagonistic to other class members whether they are presently known or unknown. The proposed class representatives have actively participated in legal processes, showing commitment to the case. They all seek damages under the same legal theories, even if individual damages vary. The court also confirmed the competence of the proposed attorneys, Suzette and Emile Bagneris.

## *DEFINABILITY*

For a class action to proceed, the class must be objectively definable based on ascertainable criteria, without requiring the court to analyze each member's individual case. The trial court provided the class definition after rejecting the definition proposed by Appellees' counsel as overly broad. For a class to be "objectively defined" only requires that the definition supply an objective standard by which the court or a potential plaintiff may know who belongs in the class. Citing *Duhe*, the court in *Brantley v. City of Gretna*, 21-574, p.22 (La. App. 5 Cir. 8/5/22), 347 So. 3d 1147, 1166, wrote:

> The purpose of the class definition requirement is to ensure that the class is not amorphous, indeterminate, or vague, so that any potential class members can readily determine if she or he is a member of the class. *Id*. The class need not be so clearly defined that every class member can be identified at the commencement of the action, as the trial court *may* modify the class as needed when discovery or the trial adds relevant facts to the record. (emphasis in original)

The class definition of the trial court is clear and simple. Anyone reading may readily know who is a potential plaintiff. We hold that the district court definition meets the statutory and jurisprudential standards of definability.

13

## La. C. C. P. art. 591(B) considerations

In addition to meeting all the requirements of La. C.C.P. art. 591(A), Appellees must also satisfy at least one of the subsections of La. C.C.P. art. 591(B). Our review of the evidence reveals that the facts proven by Appellees comfortably meet every test set forth in art. 591(B).[13]   However, the trial court judgment that we must review chose to focus on art. 591(B)(3), holding that Appellees met the legal requirement of that subpart. Having so held, the trial court chose not to examine other subparts of the article. This choice is appropriate because Appellees were required to prove that they met only one of the three subparts. We agree with the trial court's finding of fact and conclusion of law in this regard.

Predominance, as used in art. 591(B),

> …tests "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." This court has explained that the predominance requirement is more demanding than the commonality requirement, because it "entails identifying the substantive issues that will control the outcome, assessing which

---

[13] La. Code Civ. Proc. art. 591(B)(3) provides:

(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:

(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;

(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c) The desirability or undesirability of concentrating the litigation in the particular forum;

(d) The difficulties likely to be encountered in the management of a class action;

(e) The practical ability of individual class members to pursue their claims without class certification;

(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation; or

> issues will predominate, and then determining whether the issues are common to the class," a process that ultimately "prevents the class from degenerating into a series of individual trials."

*Dupree v. Lafayette Ins. Co.*, 09-2602. p. 8 (La. 11/30/10), 51 So.3d 673, 683. (internal citations omitted).

The trial court noted that, "If separate trials were to be ordered for each potential plaintiff, the same fact witnesses, expert witnesses, exhibits, and trial preparation would be necessary for each individual trial." We do not yet know how large or small Appellees' claims may be. We are not tasked with deciding this at the moment. However, Appellants argue that none of the Appellees have suffered any damages. If, in fact, these individual claims are of little monetary value, the filing fees and court costs alone may act as a practical bar to court access. As we wrote above, the Appellees' differing claims of damages is not the proper point of focus in this case. We must instead place our attention on the many points of commonality that predominates over all Appellees' claims. At a future trial, Appellees must prove allegations that may be generally be characterized as mismanagement and fraud by a single defendant, NBSF. A court must explore many allegedly improper actions by NBSF employees to learn if those allegations are true. Judicial economy and fairness dictate that a class action would relieve the burden on the court and the litigants of proving the same facts repetitively.[14]

Appellees' third amended petition includes 22 named graduates and their parents. The trial court correctly observed that many separate trials (a minimum of 22 trials) on the merits of these claims would create real risks of inconsistent adjudications. These trials could also be dispositive of the interests of members of

---

[14] According to Appellees' third amended petition, there are 22 students plus their family members who are named plaintiffs. Assuming one trial per family at a minimum, the burden of costs to litigants and time and effort of the court and attorneys for 22 trials to find the same facts is far inferior to a single trial to determine the facts common to all claims.

the class who are not parties to this suit, thereby substantially impairing their ability to control the outcome of their individual claims. The trial court's observation in this regard falls in line with the considerations enumerated in art. 591(B)(a), (e), and (f).

Keeping in mind that the trial court retains authority to amend the class as it is presently defined or to reverse its decision altogether shows the wisdom of the trial court in adhering to our Supreme Court's instruction to maintain a class that has been certified as it was here. As we observed above, there is ongoing discovery that may cause the trial court to alter or reverse the class determination. Given the common character of rights, claims and substantive law, the class action is superior to alternative adjudications in promoting judicial efficiency.

**Conclusion**

In this case, we are called upon to determine whether the district court's determinations of fact were manifestly erroneous and whether that court's legal holdings abused the "wide discretion"[15] accorded in class certification issues. We find that the facts found by the trial court are amply supported by the record in this case and are demonstrably correct. Similarly, we hold that the trial correctly applied the law to the facts shown at trial. For these reasons, we affirm the judgment of the trial court.

**AFFIRMED**

---

[15] *Robert* at 381 So. 3d 723.

16